IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| XYKIRRA C., a minor, Individually and By and Through Her Parent, STEPHANIE C. | : : : : | CIVIL ACTION |
| Plaintiffs, | : : | |
| v. | : : | |
| THE SCHOOL DISTRICT OF PHILADELPHIA | : : : | NO. 12-4251 |
| Defendant. | : | |

**MEMORANDUM**

BUCKWALTER, S.J.                                                                                                May 8, 2013

Currently pending before the Court are the Cross-Motions for Judgment on the Administrative Record of Plaintiffs Xykirra C. and her Mother Stephanie C. and Defendant School District of Philadelphia ("School District" or "District"). For the following reasons, the School District's Motion is granted and Plaintiffs' Motion is denied.

**I.      FACTUAL AND PROCEDURAL BACKGROUND[1]**

Plaintiff Xykirra C. is a fourteen year old girl who resides with her mother, Plaintiff Stephanie C. In March 2010, Xykirra witnessed an incident in which her mother became involved in an altercation with a police officer. (H.O.D. 3.) As a result of this altercation, Xykirra's mother was placed under arrest and confined. (Id.) Following this incident, Xykirra's psychiatrist recommended she remain home due to reported anxiety regarding contact with police

---

[1] Citations in this section will generally be to the Hearing Officer's findings of fact in his Decision ("H.O.D.").

and returning to school. (Id. at 4.) In March, 2010, the School District approved Xykirra for homebound services. (Id.) These services continued based on an administrative decision by the District until the end of the 2009–10 school year. (Id.)

Prior to the 2010–11 school year, the District's school nurse in charge of approving homebound services reviewed a request by Xykirra's psychiatrist to extend homebound services. (Id. at 5.) In September and December of 2010, the District renewed this approval, though it is normally unusual for it to do so. (Id.) The District's nurse attempted to obtain further information from the behavioral health agency that provided psychotherapy to Xykirra. (Id. at 7.) However, from the beginning of homebound instruction, Xykirra's mother restricted the District nurse's access to therapists and the psychiatrist by insisting that any conversation with the therapists be conducted only with the parent's presence. (Id.) When such conversation occurred, Xykirra's mother interfered with the District nurse's ability to discuss Xykirra's return to school with the therapist. (Id.) While receiving homebound services, Xykirra was never evaluated for special education. (Id. at 8.)

In February of 2011, Xykirra's mother submitted a physician referral for continued homebound services. (Id. at 9.) The treating psychiatrist recommended homebound services due to Xykirra's anxiety. (Id..) The District's nurse believed that Xykirra was capable of returning to school with supports and accommodations. (Id. at 10.) On March 31, 2011, the District denied the request for additional homebound services and terminated current homebound services because there was not enough information in the doctor's referral to indicate (1) why Xykirra had not progressed sufficiently under the psychiatrist's care to be able to return to school for at least partial days and (2) because the information available did not demonstrate a plan for Xykirra's

2

return. (Id. at 11.) The District planned for a transition of Xykirra back to school, including supports in school, evaluation, and a meeting after her return. (Id. at 12.) Xykirra's mother was not consulted in preparation of the transition. (Id. at 13.) District personnel advised Xykirra's mother that there was no appeal from the District's denial of homebound services. (Id. at 14.)

Xykirra's mother continued to keep her daughter home from school from March 31, 2011 until September 6, 2011, when she enrolled Xykirra in a cyber charter school. (Id. at 15.) Xykirra did not receive any educational services during this period. (Id.)

In January of 2011, the District's nurse consulted with personnel from the Department of Education and had been advised to consider evaluation of Xykirra due to her lengthy absence from school. (Id. at 17.) The District issued a "permission to evaluate" form to Xykirra's mother, who completed it in April of 2011. (Id.) It was apparent that a medical health professional had written some of the responses for Xykirra's mother. (Id.) The District issued its evaluation report in May of 2011. (Id.) The District initiated truancy proceedings against Xykirra, and the court ordered her to return to school. (Id. at 16.)

In reaching the conclusions in its evaluation report, the District relied upon its psychologist, who is both certified as a school psychologist and licensed as a clinical psychologist in Pennsylvania. (Id. at 18.) The school's psychologist reviewed Xykirra's files and records. (Id. at 19.) Though there was no classroom observation, as Xykirra was not in school, the District's psychologist did not believe this reduced the validity of the evaluation. The psychologist spoke with a former teacher, the special education liaison, and with Xykirra's mother. (Id.) Xykirra's mother filled out a developmental history form with the assistance of a person from the behavioral health agency treating Xykirra. (Id.) This person wrote part of

3

Xykirra's mother's answers on the form. (Id.) In August of 2011, the school psychologist reviewed some, but not all of the referral forms that had been sent to the District in support of Xykirra's mother's requests for homebound instruction. (Id. at 20.) The school psychologist did not speak to or obtain information from Xykirra's homebound instructors, though some effort was made during the summer of 2011 to obtain recommendations from one of the homebound instructors. (Id. at 21.) Specifically, the evaluator asked Xykirra's mother to submit a behavior rating form to one of the homebound instructors, but she declined to do so. (Id. at 21.)

The school psychologist conducted a single lengthy evaluation at Xykirra's home. (Id. at 22.) While standardized procedures were followed for testing, the environment was not appropriate for testing, as there were numerous distractions that could have reduced Xykirra's performance on cognitive and achievement tests. (Id.) The school psychologist solicited a behavior rating inventory form from Xykirra, but her mother tried to fill out answers for her. (Id. at 23.) As a result, the returned inventory form was invalid as it was not filled in by Xykirra in the presence of her evaluator. (Id.) Xykirra's test performance demonstrated no significant discrepancy between her ability and her performance. (Id. at 24.) Her processing speed was a weakness, which was reflected in a lower score in math fluency, but this did not merit her identification as a child with a disability because it could be accommodated by allowing her extra time in regular education, which was recommended. (Id.) Xykirra's mother's behavior inventory did not disclose any emotional difficulties that would require identifying Xykirra as a child with a disability. (Id. at 25.)

Pursuant to a release requested on June 29, 2011 and signed by Xykirra's mother on July 8, 2011, District personnel were able to obtain a psychosocial evaluation from the behavioral

health agency that provided treatment services to Xykirra. (Id. at 26.) This information was sought for the purpose of re-evaluation. (Id.) However, full documentation was not received until August of 2011, and the District's evaluator was given the impression that Xykirra's mother was sensitive to any communication that might exceed her permission, which was limited to reviews of records and did not include conversation with staff at the behavioral health agency. (Id.)

The psychosocial evaluation from the behavioral health agency did not support a need for homebound services. (Id. at 29.) The District's recommendation that Xykirra be given support in her transition back to school also concluded that she did not have emotional needs that would interfere with her learning. (Id. at 28.)

On December 13, 2011, Xykirra and her mother sought a due process hearing under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq., and § 504 of the Rehabilitation Act, 29 U.S.C. § 794 seeking compensatory education from March 10, 2010 through September 6, 2011. The subsequent hearing took place in two sessions on February 27, 2012 and March 30, 2012. In a written decision, the Hearing Officer found for the School District. In so finding, he reached three conclusions. First, he determined that the District should have initiated an evaluation earlier, in August of 2010, when it first received a request to extend Xykirra's homebound services. His second finding, however, was that this failure to evaluate in a timely fashion did not deprive Xykirra of a free appropriate public education ("FAPE"). This finding stemmed from the fact that (1) a preponderance of the evidence does not suggest Xykira's mother would have consented to evaluation in August of 2010 as she was affirmatively resisting the efforts of the District to communicate with the behavioral health agency providing psychiatric

justification for the request for homebound services; (2) there is no indication by a preponderance of the evidence that Xykirra would have been found to suffer from a learning disability if she had been tested earlier; and (3) there is no indication that any disability Xykirra suffered interfered with her ability to learn in the home setting while receiving homebound services.  Finally, the Hearing Officer concluded that the District's eventual evaluation, though late, was appropriate under §504 standards.

## II.     STANDARD OF REVIEW

This action arises pursuant to the Individuals with Disabilities Education Act of 1997 ("IDEA"), 20 U.S.C. § 1400 et seq. and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq.  The IDEA requires institutions receiving federal education funding to supply all children with disabilities a "free and appropriate public education" ("FAPE").  20 U.S.C. § 1400(d)(1)(A).  "'When parents challenge [the adequacy of] a school's provision of a [FAPE] to a child, a reviewing court must (1) consider whether the school district complied with the IDEA's procedural requirements and (2) determine whether the educational program was 'reasonably calculated to enable the child to receive educational benefits.'"  D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564–565 (3d Cir. 2010) (quoting Mary T. v. Sch. Dist., 575 F.3d 235, 249 (3d Cir. 2009)).  Similarly, Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability by programs that receive federal funds. Under Section 504, recipients of federal funds must "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap."  34 C.F.R. § 104.33(a).[2]

---

[2]The claims in this case under the IDEA and Section 504 are parallel.

A state must comply with the "Child Find"[3] obligation of the IDEA, which requires that a state have a system in place to identify, locate, and evaluate all potentially disabled children within the state. G.D. v. Wissahickon Sch. Dist., 832 F. Supp. 2d 455, 462 (E.D. Pa. 2011) (citing 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111(a)). "The school district must conduct an evaluation of the student's needs, assessing all areas of suspected disability, before providing special education and related services to the child." P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 730 (3d Cir. Pa. 2009) (citing U.S.C. § 1414(b)). School districts provide a FAPE by designing and implementing an individualized instructional program set forth in an Individualized Education Plan ("IEP"), which "must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004) (other citations and internal quotation marks omitted).

When a state educational agency's hearing officer has held a due process hearing to decide whether a student has been denied a FAPE, federal district courts have jurisdiction to review his decisions. 20 U.S.C. § 1415(i)(2). The court shall review the records of the administrative proceedings, hear additional evidence at the request of a party, and, based on a preponderance of the evidence, grant such relief as it determines is appropriate. Id. In making its determination, the court must give "due weight" to the hearing officer's decision. Bd. of Educ. v. Rowley, 458 U.S. 176, 205–06 (1982). Courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." The Third Circuit has defined "due weight" as requiring district courts to conduct a "modified de novo review" of

---

[3]Pennsylvania codifies its "Child Find" duties at 22 Pa. Code. §§ 14.121-14.125.

administrative proceedings. S.H. v. State-Operated Sch. Dist. of the City of Newark, 336 F.3d 260, 270 (3d Cir. 2003). A federal district court reviewing an administrative fact-finder's conclusions must defer to such factual findings unless the court identifies contrary non-testimonial extrinsic evidence in the record or explains that the record read in its entirety compels a different conclusion. S.H. v. State-Operated Sch. Dist., 336 F.3d 260, 270 (3d Cir. 2003). The court's review of conclusions of law, however, requires no deference to the state hearing officer's legal determinations. S.H., 336 F.3d at 271.

## III. DISCUSSION

Xykirra and her mother challenge the Hearing Officer's decision on two grounds. First, they claim that the Hearing Officer erred when he found that Xykirra was not deprived a free and appropriate public education. Second, they claim that the Hearing Officer erred when he found that the School District's initial evaluation of Xykirra was appropriate. Conversely, the School District argues that the Hearing Officer's opinions were appropriate, supported by the factual findings, and that Plaintiffs have offered no contrary non-testimonial evidence to challenge the Hearing Officer's findings.

### A. There Is No Evidence To Suggest The Hearing Officer's Conclusions Were Incorrect

As noted above, the Hearing Officer found that, though the School District delayed in conducting an evaluation of Xykirra, this delay did not deprive her of a FAPE because (1) a preponderance of the evidence does not suggest Xykira's mother would have consented to evaluation in August of 2010 as she was affirmatively resisting the efforts of the District to communicate with the behavioral health agency providing psychiatric justification for the request

8

for homebound services; (2) there is no indication by a preponderance of the evidence that Xykirra would have been found to suffer from a learning disability if she had been tested earlier; and (3) there is no indication that any disability Xykirra suffered interfered with her ability to learn in the home setting while receiving homebound services. Plaintiffs challenge all three of these determinations.

First, Plaintiffs argue that the Hearing Officer's findings that Xykirra's mother would not have approved of an evaluation in August of 2010 were speculative and not based on the evidence. As an initial matter, the Court notes that the Hearing Officer did not state without qualification that Xykirra's mother would *not* have approved an earlier evaluation, only that there was not a preponderance of the evidence suggesting she *would* have done so. Setting this distinction aside, the Court finds that the Hearing Officer's findings that Xykirra's mother interfered with the District's ability to evaluate Xykirra are sufficient to support his decision. Plaintiffs have not demonstrated by a preponderance of the evidence that the Hearing Officer's conclusion was erroneous, nor have they introduced contrary non-testimonial evidence that challenges his decision. The factual findings that (a) Xykirra's mother had a mental health professional fill out answers on her permission to evaluate form and her developmental history form and (b) the finding that Xykirra's mother limited the amount of communication the District could have with behavioral health agency staff is enough to find by a preponderance of the evidence that she was actively working to prevent the District from conducting a full and appropriate evaluation.

Second, Plaintiffs challenge the Hearing Officer's finding that, if an evaluation had been conducted earlier, it is unlikely that Xykirra would have been found to have a disability when the

9

May 2011 evaluation concluded she did not. Plaintiffs compare the May 2011 evaluation (which concluded that Xykirra did not have a disability) with the August 2011 evaluation once the District received additional documents (which concluded that Xykirra should have a 504 plan to address her emotional needs while in transition back to school). Plaintiffs argue that the later decision, which was based upon additional records and information, indicates that an earlier timely decision would have reached the conclusion that Xykirra was disabled. Plaintiffs' argument, however, confuses the issue. The August 2011 evaluation did *not* conclude that Xykirra had a learning disability. Rather, it concluded that there should be some support to help Xykirra's emotional needs as she transitioned back to school. It continued to conclude that Xykirra did *not* have emotional needs that would interfere with her learning.

Finally, Plaintiffs challenge the Hearing Officer's conclusion that there is no indication that any disability from which Xykirra suffered interfered with her ability to learn in the home setting while receiving homebound services. Plaintiffs contend that Xykirra's extended homebound instruction without adequate accommodations is itself a deprivation of a FAPE. Additionally, they argue that the School District could have transitioned Xykirra back to school with the support of a 504 plan much earlier (with or without Xykirra's mother's approval). The Hearing Officer found, however, that the evaluators concluded that any emotional issues Xykirra had did not interfere with her ability to learn—either in the school environment or at home. Thus, without a demonstration that the homebound services Xykirra received at home were inadequate, it cannot follow that the Hearing Officer's conclusion was incorrect.[4]

---

[4]Plaintiff relies on testimony from Betty Klear, principal of Xykirra's School, and Michelle Diamond, the District's Special Education Liaison, that Xykirra's homebound services were inadequate. The Court will not overturn the Hearing Officer's decisions based on

### B. The Hearing Officer Correctly Found That the May 2011 Evaluation Was Appropriate

Plaintiffs also contend that the May 2011 evaluation, which determined that Xykirra did not suffer from a learning disability or require a 504 plan, was inappropriate because the August 2011 evaluation determined Xykirra required a 504 plan to assist her in transitioning back to school. As discussed above, the August 2011 evaluation did *not* conclude that Xykirra had an emotional disability that would interfere with her ability to learn. Rather, it concluded that Xykirra should have some support and assistance solely to help her emotional needs as she transitioned back to school. The August 2011 evaluation agreed with the May 2011 evaluation that Xykirra did *not* have emotional needs that would interfere with her ability to learn. As such, Plaintiffs have not met their burden to provide evidence and demonstrate that the Hearing Officer's conclusion was erroneous or unsupported by the evidence.

### IV. CONCLUSION

For the above stated reasons, Defendant's Motion is granted and Plaintiff's Motion is denied. Plaintiffs have not met their burden to demonstrate that the Hearing Officer's conclusions were erroneous. There appears to be no contrary non-testimonial evidence in the record to contradict or challenge the Hearing Officer's determinations. As such, in the absence of evidence suggesting it do so, the Court will not substitute its own "notion of sound educational policy for those of the school authorities."

An appropriate Order follows.

---

testimonial evidence. See S.H., 336 F.3d at 270 (holding that a federal court must defer to an administrative fact finder's conclusions unless the court identifies contrary non-testimonial extrinsic evidence in the record).